**BUCK et al. v. GIBBS, Atty. Gen. of Florida, et al.**

**No. 12.**

District Court, N. D. Florida, Gainesville Division.

Aug. 5, 1940.

512

Frank J. Wideman, of Washington, D. C., and Manley P. Caldwell, of West Palm Beach, Fla. (Louis D. Frohlich and Herman Finkelstein, both of New York City, of counsel), for plaintiffs.

George Couper Gibbs, Atty. Gen., of Florida (Thomas J. Ellis, Asst. Atty. Gen., Lucien H. Boggs, Sp. Asst. Atty. Gen., and Andrew W. Bennett, of Washington, D. C., of counsel), for defendants.

Before HUTCHESON, Circuit Judge, and LONG and BARKER, District Judges.

HUTCHESON, Circuit Judge.

Plaintiffs are owners of musical copyrights or rights of renewal therein, which have been pooled with the American Society of Composers, Authors and Publishers, hereafter called ASCAP. Defendants are the state officers charged with enforcement of the two statutes the suit brings in question. As originally brought, the suit was to enjoin the enforcement of Chap. 17807, Laws of Florida, 1937.[1] There was a temporary injunction, an appeal and an

---

[1] 1937 Act, Chapter 17807.

Section 1. Prohibits combinations of authors, composers, publishers, owners of copyrighted vocal or instrumental musical compositions from forming any society, association, partnership, corporation or other group or entity, when the members therein constitute a substantial number of those owning or controlling copyrighted vocal or instrumental musical compositions and when one of the objects of such combination is the determination and fixation of license fees, required by such combination for any use or rendition of copyrighted vocal or instrumental musical compositions for private or public performance for profit, declares the association so formed unlawful, prohibits the collection of license fees so fixed and makes persons collecting or attempting to collect them subject to the penalties of the Act.

Section 2-A. Requires selling prices to be stated on sheet music or records and gives purchaser general public performance rights to use for all purposes on paying such price.

Section 2-B. Provides if selling price not so fixed, purchaser of the composition may use the composition privately or publicly without further license fee and exempts such purchaser from accountability to the copyright owner.

Section 2-C. Declares against purpose to give a purchaser general right to resell or distribute; or to prevent copyright holders from determining prices not in combinations forbidden in Section 1.

Section 3. Declares void existing contracts contrary to the Act and makes their attempted enforcement illegal.

Section 4-A. Relieves Florida broadcasting stations from payment of license fee for re-broadcast of copyrighted music controlled by a combination prohibited by Section 1.

Section 4-B. Similarly forbids collection by outside station of license fees to unlawful combination.

Sections 5-A and 5-B. Counterparts of Section 4-A and 4-B, except relating to theatres, etc.

Section 6. Concerning music broadcast or emanating from without the state,

affirmance.[2] After the enactment of Chapter 19653, Florida Laws, 1939,[3] it was extended by a supplemental bill to include that chapter in its scope and to obtain injunctive relief, temporary and permanent as to it.

The claim of the original and supplemental bills in general was: that the statutes were confessedly aimed at ASCAP and its constituent members and were class legislation of the most indefensible kind and that in addition to violating the equal

makes outside source of emanation solely liable for compensation to copyright owner and deprives owner of right to collect from Florida user.

Section 7-A. Provides for service of process on agent of outside combination.

Section 7-B. Declares such an agent a part of the combination for which he acts and as such, subject to all the penalties of the Act.

Section 8. Penalty clause for violation of Act.

Section 9. Confers jurisdiction on circuit courts and designates state attorneys under Attorney General to enforce public rights and penal provisions, particularly to dissolve unlawful combinations and otherwise enforce Section 1.

Section 10-A and 10-B. Confers jurisdiction on circuit courts in private suits under the Act.

Section 11-A and 11-B. Provides for discovery of documentary evidence and penalty for failure to produce same.

Section 12. Severability clause.

Section 13. Makes act and rights thereunder cumulative to rights and remedies under existing law.

Section 14. Effective date. (Approved and effective June 9, 1937).

[2] Gibbs v. Buck, 307 U.S. 66, 59 S.Ct. 725, 83 L.Ed. 1111.

[3] 1939 Act, Chapter 19653.

Section 1. Definitions. Defines blanket license as including any device whereby public performance for profit is authorized of the combined copyright of two or more owners. The term blanket royalty or fee includes any device whereby prices for performing rights are not based on the public performance of individual copyrights.

Section 2. (Disclosure section). Requires seller of public performance rights in copyrighted music to file with Comptroller a list showing name and title of composition, date and number of copyright, names of author, publisher and present owner and owner of performance rights, with provision for filing additional lists and filing fee of two cents per composition; also for filing affidavit describing rights intended to be sold and verifying the statements in the listing or registration, with name, agent, occupation, residence and authority of affiant.

Section 3. Makes such lists available for public inspection and taking copies

"in order that any user * * * may be fully advised concerning the performing rights * * * and avoid being overreached * * * and avoid committing innocent infringement." Comptroller may publish lists and must give certified copies and anyone selling, licensing or otherwise disposing of performing rights, must exhibit them.

Section 4-A. Makes it unlawful "for two or more owners" of musical or dramatics musical copyrights to associate or combine together for purposes of issuing blanket public performance licenses upon a blanket royalty or fee unless each owner or such combination shall make available to each user of such composition within the state the right to perform each at a price established for each separate performance by filing with the Comptroller either as part of the list under Section 2 or separately a schedule or prices for the performing rights to each separate performance with affidavit that such price was fixed by the copyright owner alone and not in combination with other owners —with provision for reasonable classification by uses if without unreasonable discrimination; and for filing new schedules at any time effective seven days from filing, and for public inspection of publication of schedules.

Section 4-B. Provides any person issuing a blanket license shall file verified copies of blanket performance license with Comptroller within thirty days after issuance and fixes filing fee.

Section 4-C. Prohibits the sale or license of performing rights to any musical composition for a compensation based "in whole or in part on any program not containing any such composition", and makes illegal and invalid any charge for compensation so based.

Section 4-D. Makes sale of public performance rights or collection of compensation unlawful if composition not listed as provided in Section 2.

Section 5. Performing rights owner must authorize Secretary of State to accept service of process and copy shall be mailed him by Secretary.

Section 6. No action to be brought without prior compliance with Act. Comptroller to furnish copies of any papers at same fees as clerk of circuit court.

Section 7. Imposes three per cent tax on gross receipts, provides for annual tax return, inspection and audit of books

protection, liberty of contract and due process clauses of the Fourteenth Amendment, they violated various other constitutional provisions, Federal[4] and State.[5]

In particular the claim as to ASCAP was that it had been organized not to increase, or obtain unfair, prices for the performing rights of copyrighted musical compositions, but to protect authors, owners and publishers from the systematic piracy of their performing rights which, acting alone, they were powerless to prevent. And there was the further claim as to it that by fair and reasonable contracts and arrangements, it had at the same time afforded full public use of and access to copyrighted musical compositions at fair and reasonable prices, and secured to copyright owners, the benefits of the copyright law. While the claim as to the statutes in question was that they had been enacted, not in response to a public need, to make effective the general will of the people of Florida, but at the instigation of an organized group or band of radio broadcasters and other users of music in order that, the association stricken down and outlawed in Florida, they might with complete impunity again pirate the performing rights to copyrighted musical compositions without making payment to the owners therefor. As to the 1937 statute, the claim in general was that, though put forward as an anti-monopoly statute, it was really a statute designed and enacted, in the interest and at the behest of this anti-copy-right group, to deprive the members of the society of the protection, in Florida, of the copyright laws. In particular it was that, by at once outlawing ASCAP and providing for the performance, without compensation to them, of the copyrighted vocal or instrumental musical compositions of its members, the statute undertook in effect to nullify the copyright laws and to take plaintiffs' properties in their copyrighted compositions without compensation and without due process.

As to the 1939 statute, the claim was that its rigorous provisions for registration, its prohibitions against and restriction on blanket licensing, its prohibitions against collection of compensation when based in whole or in part on any program not containing such composition and its general provisions for filing fees, taxes, etc., are so in derogation of the rights of owners under the copyright law, and so onerous, that they amount to an illegal taking for private use, that is, for the benefit of broadcasters and other users, of plaintiffs' rights in and under their copyrights.

The defense in general was: a denial that the legislation was oppressively or partisanly conceived and that it operated in violation of any constitutional protection, and an assertion that it aimed at and constitutionally reached, the evils of a combination, to fix prices and in restraint of trade. A combination, organized and operating to fix the prices to be paid for, and to restrain freedom of trade in, the public

by Comptroller and provides for means of collection.

Section 8. Makes unlawful public performance of compositions without authority of owner if he has complied with the statute.

Section 9. Makes violations misdemeanors under general law.

Section 10. Makes agents of owners subject to the statute.

Section 11. Confers on circuit courts jurisdiction of private suits.

Section 12. Confers on circuit courts jurisdiction of enforcement of public rights by state attorneys under Attorney General upon complaint of a person aggrieved.

Section 13. If prosecuting officers fail to act, aggrieved party may bring such civil action as state officers might have brought.

Section 14. Appropriates taxes above expenses to general revenue fund.

Section 15. Supersedes inconsistent laws with express saving clause as to prior lawful contracts and "any of the statutes of the State of Florida pertaining to monopoly or restraint of trade" including but not limiting the generalities of the foregoing sections 1, 2-C, 3, 4, 5, 7, 8, 9, 10, 11, 12, 13 and 14, Chap. 17807, Laws of Florida, 1937. Provides for filing copies of existing contracts within thirty days and for compliance otherwise with Act within thirty days.

Section 16. Severability clause.

Section 17. Effective date. (Filed and effective June 12, 1939).

[4] The Copyright Clause (Art. 1, Sec. 8, Cl. 8) and the Federal Laws enacted pursuant thereto; the Impairment of Contract Clause (Art. 1, Sec. 10); the Privileges and Immunities Clause (Art. 4, Sec. 2); the Interstate Commerce Clause (Art. 1, Sec. 8, Cl. 3).

[5] The privilege against self-incrimination (Sec. 12, Declaration of Rights); the prohibition of cruel and unusual punishment (Sec. 8, Declaration of Rights); the Equal Protection and Liberty of Contract Clauses (Sec. 1, Declaration of Rights).

performance of individual copyrighted musical compositions at a fair price per use, by blanketing them together under general licenses covering many compositions of many owners, authors and composers, and refusing to license or permit the licensing individually and per use of particular compositions. In particular the defense as to the 1937 Act was: that it was an anti-monopoly Act and that taken as such it was valid; that sections ·2-A and 2-B and 6, which purport to authorize the performance within the state of copyrighted musical compositions without payment by the users therefor, have been repealed by the 1939 Act; and that the remaining sections are valid and the Act as to them must stand as an anti-monopoly Act condemning and making illegal, combinations like those of ASCAP and the other plaintiffs.

As to the 1939 Act, the defense was: that it is in general an Act for disclosure, and as such is valid under Allen v. Riley, 203 U.S. 347, 27 S.Ct. 95, 51 L.Ed. 216, 8 Ann.Cas. 137; and that its other provisions requiring blanket licenses by two or more persons and prohibiting sales or licenses at a price, based other than on a use in a program of the particular music sold or licensed, are mere regulatory measures to reach and do away with the evils of blanket licensing in all its forms.

With their contentions thus put forward, plaintiffs and defendants ring the changes on their respective arguments. Plaintiffs urge upon us that ASCAP is a beneficial, defendants that it is an evil institution; plaintiffs that the copyright laws protect them from the legislation; defendants that copyright owners may not, any more than others, form combinations to monopolize or restrain trade. If the case were as simple in its issues as each contender thinks it is, if it turned, on the one hand, simply on whether plaintiffs had rights and, on the other, as simply on whether these rights were subject to regulation, we could and would end it quite simply by saying to defendants, "The plaintiffs certainly do have rights in their copyrighted musical compositions", and to plaintiffs, "These rights are certainly not beyond reasonable state regulation".

But the answer to the questions the suit raises is not so simply found. For conceding both plaintiffs' rights and the State's power to subject them to reasonable regulation, the difficulty remains of determining whether the statutes in question are unreasonable prohibitions masking under the guise of regulation, or if regulations, whether, unduly and beyond the legitimate purpose to be served, they hamper and restrict plaintiffs' undoubted rights. In short, the question for decision comes down at last to, and is to be decided by, not a general statement of principles, for as to them there is no real dispute,[6] but a construction and interpretation of the statutes

---

[6] They are sufficiently stated for our purpose in Buck v. Swanson, D.C., 33 F. Supp. 377, dealing with a Nebraska statute of the same purport as the Fla.1937 Act, and we need not restate them here. Other authorities not cited in Buck's case, which may be consulted are: For the plaintiffs: Lawton v. Steele, 152 U. S. 133, 14 S.Ct. 499, 38 L.Ed. 385; Hale v. Bimco Trading, 306 U.S. 375, 59 S. Ct. 526, 83 L.Ed. 771; State ex rel. Fulton v. Ives, 123 Fla. 401, 167 So. 394; People's Petroleum Producers v. Sterling, D.C., 60 F.2d 1041, at page 1047; McLeaish & Co. v. Binford, D.C., 52 F.2d 151; Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522, at page 539, 43 S.Ct. 630, 67 L.Ed. 1103, 27 A.L.R. 1280; Smith v. St. Louis & S. W. R. Co., 181 U.S. at page 255, 21 S.Ct. 603, 45 L.Ed. 847; McFarland v. American Sugar Refining Co., 241 U.S. 79, 36 S.Ct. 498, 60 L.Ed. 899; Herbert v. Shanley Co., 242 U.S. 591, 37 S.Ct. 232, 61 L.Ed. 511; Buck v. Jewell-La Salle Realty Co., 283 U.S. 191, 51 S.Ct. 410, 75 L.Ed. 971; Remick & Co. v. American Automobile Accessories Co., 6 Cir., 5 F. 2d 411, 40 A.L.R. 1511.

For the defendants: Allen v. Riley, 203 U.S. 347, 27 S.Ct. 95, 51 L.Ed. 216, 8 Ann.Cas. 137; Fox Film Corp. v. Doyal, 286 U.S. 123, 52 S.Ct. 546, 76 L. Ed. 1010; Carbice Corp. v. Amer. Patents Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; Straus v. American Publishers Ass'n, 231 U.S. 222, 34 S.Ct. 84, 58 L.Ed. 192, L.R.A.1915A, 1099, Ann. Cas.1915A, 369; Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; Strassheim v. Daily, 221 U.S. 280, 31 S.Ct. 558, 55 L.Ed. 735; Ford v. United States, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793; Stephenson v. Binford, 287 U.S. 251, 53 S.Ct. 181, 77 L. Ed. 288, 87 A.L.R. 721; Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618-625, 84 L.Ed. 852; Tigner v. State of Texas, 60 S.Ct. 879, 84 L.Ed. 1124; United States v. Socony-Vacuum Oil Co., 60 S.Ct. 811, 84 L.Ed. 1129.

For both: Standard Oil Co. v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926.

under attack, as to what they purport to do and whether they may constitutionally do that.

Both plaintiffs and defendants see plainly enough that this is so and by an analysis both of the statutes as a whole and of each section thereof, plaintiffs undertake to show their invalidity, defendants their validity. Plaintiffs pointing to the confiscatory provisions of Sections 2-A, 2-B, 4-A, 4-B, 5-A, 5-B and 6, by which the 1937 Act undertakes to permit performance, in Florida, of copyrighted music without compensation, urge upon us that not only these sections but the statute as a whole is invalid because, not a reasonable regulation of, but a repressive prohibition of, dealings in copyrighted music, it breathes and attempts to make effective throughout the unconstitutional spirit of repression and reprisal. Outlawing ASCAP and those in association with it, and expropriating their property for the use, without compensation, of radio broadcasters and others, it, they say in violation of every constitutional principle, operates as a kind of Bill of Attainder.

Defendants concede the invalidity of Sections 2-A, 2-B and 6. Indeed at one stage of the proceedings before us they offered to submit to a permanent injunction as to them. They insist, however, that the vice of these sections is peculiar and confined to them and does not pervade the Act, and that because this is so and particularly because the Act contains a separability clause, Sec. 12, and because, in the reference in the 1939 Act to sections of the 1937 Act as unrepealed, these sections were not included, these invalid sections should, by a kind of judicial surgery, be excised from the Act, leaving it to stand in its other provisions as an anti-monopoly statute.

■ We do not think so. In complete agreement with what was said in Buck's case as to the invalidity of Sections 2-A and 2-B of the Nebraska law, we find invalid the similar sections of the Florida 1937 Law. For the same reasons, that they unreasonably interfere with and in effect deprive the owners of their copyright protection, by imposing unlawful conditions, in effect a servitude, in favor of those desiring to use them, upon the performing rights in their copyrighted musical compositions, and even under named conditions completely take the copyright, by permitting use without compensation, we find Sections 3, 4-A, 4-B, 5-A, 5-B and 6, also invalid.

There remain: Sections 1, 2-C and 3, in effect declaring ASCAP and similar societies illegal associations, outlawing its arrangements for license fees, and proscribing and making an offense, attempts to collect them; Section 7-B making persons, acting for such a combination, agents for it and liable to the penalties of the Act; Section 8 fixing the penalties; Section 9 giving the state courts jurisdiction to enforce the Act, civilly and criminally; and Sections 10-A, 10-B, 11-A and 11-B, prescribing procedure under it.

■ It is, of course, the duty of a Court, if reasonably possible, consistent with the protection of constitutional rights, to resolve all doubts as to the validity of a statute in favor of its constitutionality, sustaining it, if it can be done as a whole, or if that cannot be done, as to the part of it that is constitutional. But legislation, even though containing a separability clause, is not the enactment of isolated sections, but of a law as a whole. And the function of the Court, if there are invalid sections in a statute, is to search out, not isolated valid ones, but the valid law as a whole. To do this, a Court may, especially where the Act contains a separability clause, cut and pare and trim away its diseased parts, if, when this has been done, the live spirit of the law as enacted still remains, the living tree still stands. But, law making at last, is a legislative and not a judicial function and the search of the Court in the end is not for a law the legislature could or might have validly enacted but for the valid law it did enact. When, therefore, the vice of a statute runs through the whole of it, Courts may not, by lopping and paring away, create a statute which the structure and context of the Act as a whole shows the legislature did not intend to, indeed did not, enact. Williams v. Standard Oil Co., 278 U.S. 235, 241, 49 S.Ct. 115, 73 L.Ed. 287, 60 A.L.R. 596; Sage v. Baldwin, D.C., 55 F.2d 968, and cited cases. Looked at in this light when the whole purpose of the 1937 Act to outlaw ASCAP and its contracts and to permit users in Florida to perform compositions, dealt with in them, without pay, is kept in mind, we think it clear that the Act, in spite of its separability provision, is so far indivisible that with all the "without pay" sections stricken as invalid, the whole Act must fall. For, it may not be supposed that the legislature intended to strike down

the contracts and leave both ASCAP and its members, and the users in Florida who had been dealing with ASCAP, up in the air, with contracts already entered into and a considerable part of the compensation already paid, with no right in ASCAP or its members to collect the balance due, and none in the Florida users, without paying again under separate arrangements, to use the music they had contracted and partly paid for. We, therefore, conclude as the Court did in Buck v. Swanson, supra, that the whole Act is invalid and must fall. We are the more inclined to this view because of the inconsistent provisions in the 1939 Act, and because, while specifically providing that nothing in it shall be construed to repeal any of the statutes of the state of Florida, pertaining to monopoly or restraint of trade "including * * * Sections 1, 2-C, 3, 4, 5, 7, 8, 9, 10, 11, 12, 13 and 14 of Chapter 17807, Laws of Florida, 1937", that Act by grouping all of these sections together makes it clear that they are regarded by the legislature as forming a harmonious whole and not as isolated and independent separate laws and as a whole, they must stand or fall together. In this view it is not necessary for us to determine whether as plaintiffs claim, Section 1 is invalid, for indefiniteness and uncertainty in its provision that it shall apply to combinations only where "a substantial number" of owners are concerned. Nor is it necessary to determine whether defendants are right in their counter to this claim of plaintiffs, that if the statute might be regarded as indefinite in its application as to some, it is certainly not so in its application to plaintiffs, for they admit that they own or control substantially all of the playable copyrighted musical compositions and they may complain of the statute, not as it applies to others but only as it applies to themselves.

█ When it comes, however, to the 1939 Act we think the matter stands differently, for, having a valid purpose to compel disclosure to protect music users against imposition in the matter of copyrighted music and, except as to Sections 4-A and 4-C, which are not germane to that purpose, having gone about effecting that purpose in a reasonable way, the Act as a whole is valid and may stand with those sections stricken from it. These sections constitute clear invasions of plaintiffs' rights under federal laws for which no warrant or justification can be found in the exercise of the state's police power. They may not stand.

█ As to 4-A, it seriously invades the rights of copyright owners to sell or license or refuse to sell or license as they please and by its compulsion, opens to the public the unlimited right to use copyrighted material upon terms the owner must fix generally in advance, and under conditions which are not only unreasonable in fact but are in their nature beyond the power of the state to impose. A copyright owner has a right to sell or withhold from sale the matter of and the rights under the copyright. He cannot be made to sell his product unless he wishes to. He can make one price to one user and an entirely different price to another. The effort of this section is to compel copyright owners, if they sell to one by a blanket license, to furnish schedules giving prices of the compositions so licensed, and to permit anyone desiring to do so, to perform any piece at the price so fixed. This is a taking of plaintiffs' property in its copyright without due process, and is beyond the power of the state.

The defendants seem to recognize that this would be so if the condemned provision were not coupled in the statute with a provision permitting dealing in copyrighted music under blanket licenses. They seem to think that the permission of the statute for two or more owners to combine in a blanket license authorizes the state to impose unreasonable restrictions upon that joining.

█ This will not at all do. It is not unlawful for one or more copyright owners merely to pool their compositions for one royalty for them as pooled. Standard Oil Co. v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926. Section 4-A does not concern itself with price fixing or with combinations for price fixing; it deals only with the Act of pooling copyrighted pieces to sell them for one royalty, that is, with the selling of two or more pieces under one license. There is no conceivable public policy against such action by two or more owners and therefore no valid exercise of police power involved in a statute putting limitations on such trading. So long as persons do not unlawfully combine to fix prices, and the section in question does not deal with such unlawful combinations, there is no offense in mere pooling. And the mere fact that the statute permits to be done what without the statute it was already lawful to do, does not authorize it to impose unconstitutional restrictions upon that doing. "But a state may not impose

any condition which requires the relinquishment of a right guaranteed by the National Constitution". Sage v. Baldwin, D.C., 55 F.2d 968, at page 969. The copyright laws guarantee to owners of musical compositions, protection against the use thereof without their consent. The state of Florida may not, therefore, as a condition to their being allowed to sell in Florida, a right they already have under the Federal constitution and laws, compel them to throw open to general public use the performing rights to their compositions at a price fixed in advance.

 Section 4-C is for the same reason invalid. It undertakes to impose unreasonable restrictions on copyright owners, restrictions having no reasonable relation to the public policy the Act is designed to further, that of disclosure for the protection of the public against fraud and imposition. In attempting to prevent individuals from contracting for the use of their copyrighted music upon any price bases they and their customers may select, the Act goes clearly beyond and is wholly outside the reasonable exercise of the police power. People's Petroleum Producers v. Sterling, note 6, supra. The prohibition of the section, against basing the price upon programs in which a particular piece of music is not performed, is a completely arbitrary one and as such, it could not stand if the subject of the prohibition were uses unprotected by copyright. For, the end and aim of the prohibition is to limit the right to sell or license copyrighted musical compositions to contracts based solely upon performances per piece of each particular piece of music and to prohibit contracts arrived at on any other basis, however reasonable and well adapted to the needs of, and acceptable in, the business generally, of selling and licensing performing rights in copyrighted musical compositions. If the statute dealt with contracts for the hiring of the work and labor or the personal services, of animals or things and by its prohibition prevented, wages and salaries from being fixed except on the basis of piece work, the hire of horse, car or boat from being fixed, except upon the basis of each particular use, or journey, we think it would be admitted that such a statute would be invalid as an invasion of the right and liberty of contract, and not at all a reasonable exercise of the police power of the state. Certainly the state is in no better, the owner of a copyright in no worse position as to

rights protected by copyright, "While the Copyright Act [17 U.S.C.A. § 1 et seq.] may not enhance the right of proprietorship, it certainly does not lessen that right. As said by the Supreme Court in Caliga v. Inter Ocean Newspaper Co., supra (215 U. S. 182, 30 S.Ct. [38], 39, 54 L.Ed. 150), 'The statute created a new property right, giving to the author, after publication, the exclusive right to multiply copies for a limited period.'

"The right of an author in his intellectual production is similar to any other personal property right. It is assignable and it may be sold and transferred in its entirety, or a limited interest therein, less than the whole property, may be sold and assigned, and the various rights included in the entire ownership may be split up and assigned to different persons. Sales may be absolute or conditional and they may be with or without qualifications, limitations or restrictions. Atlantic Monthly Co. v. Post Pub. Co., D.C.Mass., 27 F.2d 556; American Tobacco Co. v. Werckmeister, supra [207 U.S. 284, 28 S.Ct. 72, 52 L.Ed. 208, 12 Ann.Cas. 595]"; Buck v. Swanson, note 6, supra [33 F.Supp. 387].

For the reasons herein stated, the injunction prayed for will be granted against the enforcement of the 1937 Act and as to Sections 4-A and 4-C in the 1939 Act; as to the remainder of the 1939 Act, it will be denied.