EX PARTE: N. VERNON HAWTHORNE.
EX PARTE: DAN J. MAHONEY.

156 So. 619.
En Banc.

M. L. *Mershon* and D. H. *Redfearn,* for Petitioner, Haw-
thorne;

James M. *Carson* and ʼHerbert S. *Sawyer,* for Petitioner,
Mahoney.

*Cary D. Landis,* Attorney General, and *Roy Campbell* and
J. V. *Keen,* Assistants, for Respondent;

S. P. *Robineau,* as *Amicus Curiae.*

## Statement of Controversy.

Two petitions for habeas corpus were allowed by this Court to have brought before it for consideration the alleged illegality of detention of petitioners, N. Vernon Hawthorne and Dan J. Mahoney, on information filed against them and under capiases issued by the Criminal Court of Record of Dade County. Both informations were alike, with the exception that one is against the party who spoke over the radio while the other is against a newspaper publisher who carried an account of the text of the speech in his newspaper as a matter of current news.

The information against the alleged principal offender, Mr. Hawthorne, is of the tenor following:

"FRED PINE, County Solicitor for the County of Dade, prosecuting for the State of Florida, in the said County, under oath, information makes that N. Vernon Hawthorne of the County of Dade and State of Florida, on the 22nd day of June, in the year of our Lord, one thousand nine hundred and thirty-four, in the County and State aforesaid, did then and there unlawfully, during the eighteen days next preceding the day of the primary election held in Dade County, Florida, on June 26th, 1934, publish and circulate a charge against and attack upon one S. P. Robineau, who was then and there a candidate in the said primary for the Democratic nomination for member of the House of Representatives of the State of Florida from Dade County, Florida, by then and there publicly stating, in the hearing of a large number of people in Dade County, Florida, over a certain radio broadcasting station in the City of Miami, and County and State aforesaid, then and there commonly known and designated as Radio Station W. I. O. D. and operated by Isle of Dreams Broadcasting Corporation, a corporation, the following, to-wit:

" 'I am very grateful to the people of Dade County for the confidence they have reposed in me in two elections in the past in which I was nominated as their State Attorney over bitter opposition. I am particularly grateful that I have just been renominated for another full term without any opposition at all.

" 'I fully expected and intended to be able to keep entirely out of this campaign and attend only to my official duties. It seems, however, that that course was not to be permitted me by some of those who have been my political enemies in the past. My name has been mentioned in political speeches in connection with the performance of my official duty by Fred Pine, who is a candidate for renomination as County Solicitor. It has been mentioned particularly in connection with Pine's reinstatement by the Senate of Florida, after he had been suspended from office by former Governor Doyle E. Carlton. He has attempted to make political capital out of the fact that I appeared before the Senate Committee in opposition to his reinstatement, and has even charged that I was sent to Tallahassee upon that mission by certain local interests.

" 'The fact is that every action I have taken against Fred Pine in Dade County or in Tallahassee was taken not at the instance or request of any political organization, but merely in the performance of my official duty, and in the fulfillment of my sacred official oath. My presence in Tallahassee, and my representation of the State of Florida before the Senate Committee, was at the request officially transmitted to me as State Attorney by the Honorable David Sholtz, Governor of Florida, as was previously done by Governor Doyle E. Carlton in connection with the removal of James E. Flood as Clerk of the Criminal Court.

" 'I have no apologies to make for any action I have

taken in those cases. Regarding the Pine affair, I assert solemnly and with all the force at my command that the evidence adduced before the Senate of the State of Florida not only amply justified the suspension, but, under the Constitution of Florida and the law of the land, required the removal of Mr. Pine as County Solicitor. It disclosed an unholy alliance between an oath-bound law enforcement officer of your county who was officially obligated to represent the State of Florida in the Criminal Court, with gangsters and racketeers who were undertaking to turn the control of this County over to the underworld.

" 'I assert not only that the evidence disclosed such a deplorable state of affairs that the Senate should have voted for removal, but I further assert that the vote of reinstatement of which Mr. Pine is so boastful was produced by the rankest kind of political manipulation, and was distinctly against the law, good government, good morals, and the best interests of Dade County's welfare. It was a most glaring example of political corruption.

" 'Upon the authority of Mr. Pine himself, I go further and say that his reinstatement was due primarily to the political manipulations of Senator Hayes Lewis of Marianna, who has long had a finger in the pie of local political racketeering, and to the political manipulations of Mr. S. P. Robineau, who was a member of the House of Representatives for Dade County, and who was supposed to do his duties as a member of the House, and to conduct himself in such manner as to serve the best interests of the people of this County.

" 'As a member of the House, it was no part of Mr. Robineau's duty to interfere with the Senate in the performance of its solemn prerogative in passing upon the evidence presented. Mr. Robineau, however, who seems to be a sort of political Siamese Twin of Pine, neglected his du-

ties, neglected the interests of the people of Dade County and of the State of Florida, in order to serve his political friend and partner, who in turn could not only serve Mr. Robineau, but could also continue to serve slot-machine operators, gamblers, racketeers and the underworld in general.

" 'In speaking of these matters, I speak from personal knowledge because I was there, and it was in pursuance of my duty as an official of Dade County and the State of Florida, that I was in the thick of that fight. And I say to you that all of the circumstances surrounding the reinstatement of Mr. Pine as County Solicitor have painted upon the political canvas of the State of Florida a disgraceful picture, and it is, of course, undeniable that Mr. Robineau was one of the leading artists in the painting of that picture. When this is discussed Mr. Pine boasts of it, and Mr. Robineau admits it.

" 'I emphasize it because it is true, and to me indicates corruption. Mr. Pine boasts of it because through such devious political maneuvers he escaped the justice he deserves. Mr. Robineau admits it, perhaps reluctantly, only because he dare not deny it.

" 'Since my name has been brought into this campaign, I think I should and can with all propriety say that the people of Dade County will never get good government unless and until they send to Tallahassee as representatives men who will represent this County truly, who will perform openly and honestly the duties with which they are intrusted, and who will not take advantage of the positions given to them in order to protect their political friends and political Siamese Twins, and who will not by their actions impede and hamper those officers who are undertaking to free this County and State from the control of gamblers, gangsters and racketeers.

" 'We can judge the future only by the past. The leopard

does not change his spots. Basing my predictions upon things that have to my knowledge happened in the past, I venture to say that if the people of this County elect Mr. Robineau again to the Legislature, he will continue to use their confidence for his own advantage, political or otherwise, and to further the political interests of some of those who are generally accepted and have proven themselves to be public enemies.

" 'The issue in this campaign is simple. The devious attempts to becloud it have become amazing, amusing and disgusting. It is not an issue of newspapers; it is not an issue of political organizations; it is an effort to secure an efficient, intelligent and * * *. After the self-labelled leadership in Mr. Robineau for six years we find ourselves in our present governmental mess. Dade County's position among the counties of Florida has become deplorable, economically and otherwise. The boastful and bombastic leadership of Mr. Robineau has apparently poured no oil on the troubled waters, but has only increased the surging tide of hostility toward Dade and the other large counties. Our only chance is to wake up.

" 'More than five thousand qualified voters of this county failed to vote at the polls on June 5th. It is your duty not only to yourselves and to your county and to your State, but to your children and your children's children to exercise your franchise by casting a conscientious ballot in the Primary to be held on next Tuesday, June 26th.

" 'In the long run, people get about the kind of government they deserve. Unless the good people of this County, as distinguished from those who are classed with public enemies, do their duty at the polls, then those of us who are trying to improve the political and governmental conditions are shadow-boxing with a ghost and laboring in vain.

" 'Let me urge that every citizen of this county who is

physically able to do so, and who is a qualified elector, go to the polls on Tuesday and cast a conscientious ballot in favor of the principles of honest government.

" 'As for me, I expect to vote for Mr. John J. Lindsey because I know him and trust him. I expect to vote against Mr. Robineau because I know him and mistrust him.

" 'The reasons given, and many more with which the public is familiar, are ample to justify my mistrust of Mr. Robineau, and heaven knows Mr. Pine has well established himself unworthy of public confidence'; without personal service upon the said S. P. Robineau of a copy of such charge and attack at least eighteen days prior to the day of the said primary: to-wit: June 26th, 1934.

"The said charge not being an answer containing defensive matter to a charge or attack made by S. P. Robineau against the said N. Vernon Hawthorne, contrary to the form of the statute in such cases made and provided, against the peace and dignity of the State of Florida.

"FRED PINE,
*"County Solicitor, Dade County, Florida."*

The information against Mr. Mahoney, the publisher, is of the same purport so will not be repeated.

Motion has been made to discharge the accused from custody. An extended oral argument on the motion has been allowed before the Court sitting *en banc.* In addition, the Court is indebted to counsel and interested parties for the assistance afforded by their able and exhaustive briefs filed in support of their respective contentions on the merits.

DAVIS, C. J.—Section 26 of Article III of the Constitution provides:

"Section 26. Laws shall be passed regulating elections, and prohibiting under adequate penalties, all undue influence

thereon from power, bribery, tumult or other improper practice."

Section 8189 (5925) C. G. L. denounces as an "improper practice" the circulation of charges and attacks against candidates within eighteen days of a primary election, without a copy of the same having been served upon whom the charge or attack is made, as by the statute required. Violation of the statute is made a misdemeanor punishable by $1,000.00 fine or one year's imprisonment, or both. An answer to a charge or attack containing only defensive matter is not to be construed to be a prohibited charge or attack within the purview of the section. Section 8189 C. G. L., 5925 R. G. S., was originally enacted as Section 10 of Chapter 6470, Acts 1913, commonly known as the "Trammell Corrupt Practices Act."

The present case is one in habeas corpus wherein the section aforesaid is attacked as an unconstitutional abridgement of Section 13 of the Declaration of Rights guaranteeing liberty of speech and of press. It is also attacked as violative of the Fourteenth Amendment to the Constitution of the United States because of (1) alleged denial of liberty and (2) indefiniteness amounting to a deprivation of liberty without due process of law.

Primary election laws are a part of the election machinery of this State, and are interwoven with the general election laws in such manner that candidates of certain major political parties rendered subject to the primary election laws can only be officially nominated, and have their names printed upon the general election ballots, by procuring their nomination in a primary election. State v. Gerow, 79 Fla. 804, 85 Sou. Rep. 144; State, *ex rel.* Harris v. Belote, 106 Fla. 938, 143 Sou. Rep. 881; State, *ex rel.* Barnett v. Gray, 107 Fla. 73, 144 Sou. Rep. 349; State, *ex rel.* Waite v. Gray, 107 Fla. 109, 144 Sou. Rep. 356.

So a primary election held under the primary election laws of this State may properly be said to be an "election" within the purview of Section 26 of Article III of the Constitution requiring statutes to be enacted to preserve election from undue influence exerted by "Improper practices." And this Court so holds.

This brings us to a consideration of the meaning and intent of Section 8189 C. G. L., 5925 R. G. S., making it unlawful for any candidate or other person, during the eighteen days next preceding a primary election to publish or circulate or cause to be published or circulated any charge or attack upon any candidate unless a "copy" of such charge or attack has been personally served upon the candidate against whom made, at least eighteen days prior to the primary.

The gist of the offense denounced by the foregoing statute is not the publishing or circulating of charges or attacks *per se,* but is the publishing or circulating of charges or attacks without the required notice thereof having been given to the affected candidate eighteen days prior to the primary.

The statute obviously contemplated charges or attacks that are capable of publication or circulation and also that such charges and attacks be of such tangible character that a "copy" of them, *in the form they are designed to be published or circulated by the author,* can be personally served on the affected candidate.

The statute has no reference to oral statements or addresses commonly referred to as campaign speeches delivered in a public forum, whether by medium of the voice alone or by the means of electrical devices contrived to disseminate the voice over a wide territory, such as by radio and the like. Nor does the prohibition of the statute extend, or purport to extend, to the mere publication of the fact in a newspaper that an address has been made by an-

other attacking a candidate and purporting to give the details of the attack so publicly made.

In fine, one of the objects of the statute appears to have been to largely, if not altogether, limit candidates and their supporters to the use of the "stump" as a means of disseminating their charges and attacks, rather than causing them to be reduced to written or visual form and thereafter scattered surreptitiously against the candidate without his having an opportunity to prepare and circulate a defense by like visual means after being served with a copy thereof.

So the statute on its face is limited to the publication or circulation of matters constituting charges or attacks reduced to a written or visual form, so contrived and intended to be published or circulated by the author of them, that they will pass from hand to hand and thereby tend to operate as a hostile influence upon the minds of the electors, if unanswered or not replied to by the affected candidate. This obviously unfair method of campaigning the Legislature deemed to be an "improper practice" and so it included a denunciation of the offensive conduct in an Act which carried in its title a reference to an intent to prohibit "corrupt" practices generally.

To epitomize, the statute is nothing more than a part of the State's statutory code of "fair competition in politics," expressly authorized to be enacted by Section 26 of Article III of our Florida Constitution, and not prohibited as an exercise of the State's police power by any provision of the Federal Constitution.

With regard to business matters, the Supreme Court of the United States has recently said of the State's police power to regulate unfair competition (Nebbia v. The People of the State of New York, 291 U. S. 502, 54 Sup. Ct. Rep. 505-516, 78 L. Ed. 940, 89 A. L. R. 1469) : "If the legislative policy be to curb unrestrained and harmful compe-

tition by measures which are not arbitrary or discriminatory it does not lie with the Courts to determine that the rule is unwise."

We construe Section 8189 C, G. L., *supra,* as an effort on the part of the Legislature to exercise its police power to promote fair play and fair competition in politics by denouncing as an "improper practice" the unannounced publication and circulation of tangible forms of charges and attacks upon a candidate of a kind designed and intended to be passed from hand to hand as hostile influences against him, without an opportunity being afforded to defend against such charges or attacks by the same means that were employed by the attacker, that is, by publishing and ciruculating replies thereto in a like tangible form that can circulate in the same way and be likely to reach the voters to the same extent as the original charges or attacks.

The statute was never intended to operate as a restraint upon the making of ordinary campaign addresses by the candidates or others, whether by radio or otherwise, nor was it so framed as to apply to the reproduction of the contents of public campaign speeches in the newspapers as a matter of ordinary news interest to readers. The libel laws, civil and criminal, afford adequate safeguard against newspapers who republish defamatory statements made by candidates or others, in campaign addresses or otherwise.

The effect of the statute is to compel the making of charges and attacks in an open forum during the closing days of a campaign, rather than resorting to the evil practice of having the same surreptitiously prepared by unknown authors for unannounced publication and circulation in newspapers, placards, handbills, or by other similar means within eighteen days before a primary election. As so read, the statute may be said to be an aid rather than a deterrent to the enjoyment of the right of free speech and

press, by restraining the launching of secretly prepared charges and attacks sponsored by persons whose identity may or may not be disclosed, unless a copy of the proposed attacks and charges intended to be made during the last days of a campaign shall be either personally served upon the affected candidate or first revealed in the form of a campaign address delivered by a person whose identity and sponsorship is obviously then a matter of common knowldege and therefore not necessary to be conveyed to the affected candidate in the form of a notice served upon him.

The gist of the statute is to be found in its requirement of reasonable notice of attacks and charges designed to be put afloat for public circulation in a form not likely to be readily found out by the attacked candidate. The public forum of the speaker's platform and the ordinary medium of the press as a means of editorial expression is sufficiently public to make the service of notice of charges and attacks made by such ordinary media of publication wholly unnecessary.

As so construed by us it has not been made to appear that Section 8189 C. G. L., 5925 R. G. S., is on its face violative of any provision of either the State or Federal Constitution on the subject of free speech or liberty of the press, nor that its operation is in anywise subversive of anyone's constitutional liberty.

The practice denounced by the statute was a known evil of long standing at the time the Legislature passed the 1913 "Corrupt Practices Act." The police power of the State is not inhibited by the Constitution of the State or of the United States against governmental regulations made for the public welfare, that are not unreasonable, arbitrary or capricious, that have a real and substantial relation to the object sought to be attained, and which merely result in such limited restraint of the activities of candidates for public

office, and of their advocates, as may be deemed by the Legislature to be necessary to promote fair play on the candidate's part, as well as to prevent the electorate from being unduly influenced by prejudicial matters, whether true or untrue, secretly gotten up in disseminable form and premeditatedly launched at a time political experience knows is most propitious for the accomplishment of ulterior designs, namely, in the closing hours of a heated election campaign.

To thus safeguard and require the use of our public forums of political expression and privilege of free press comment in the closing days of a political campaign, in lieu of surreptitious circulation of what is commonly called "political propaganda" through subversive means is not unconstitutional. The State Constitution itself in Section 26 of Article III condemns undue influence on elections whether exerted through (1) power (2) bribery (3) tumult, or (4) other improper practice. What is an "improper practice" is for the Legislature to ascertain and prohibit under adequate penalties, within the reasonable limitations implied in the exercise of all expressly state legislative powers.

In the two cases now before us it appears that the basis of the criminal proceedings instituted against petitioners was the making of a stated radio address by one of the petitioners, the details of which were reproduced as a matter of news in a newspaper alleged to have been published and managed by the other.

None of the acts charged in the informations are within the purview or terms of Section 8189 C. G. L., 5925 R. G. S. Said statute is not applicable to the making of charges or attacks in the form or ordinary campaign addresses which the newspapers are at liberty to publish as a matter of news if they so choose, subject, of course, to the general laws of libel and slander should the charges or attacks made in the

campaign address, or published in a newspaper account of it, violate the latter laws.

It appearing that the acts charged in the informations constitute no violation of Section 8189 C. B. L., 5925 R. G. S., upon which the informations are predicated, the petitioners are discharged from custody under the capiases issued thereon.

Petitioners discharged.

WHITFIELD, TERRELL and BROWN, J. J., concur.

ELLIS, J., concurs in the conclusion.

BUFORD, J. (concurring specially).—I concur in the conclusion or judgment reached in the opinion of Mr. Chief Justice DAVIS, but I reach the conclusion by a different route.

I think the provisions of Section 5925 R. G. S., 8189 C. G. L., contravene the guarantees of Section 13 of the Declaration of Rights as contained in our State Constitution as to liberty of speech and press and also violates the Fourteenth Amendment to the Federal Constitution, both because of its denial of liberty and because of being so vague and uncertain as to propose to deprive one of liberty without due process of law.

As I view the statute, it is penal in character, and, therefore, must be strictly construed, if it is to be construed as having force and effect. Strictly construed, it denies to every person and the press the right to circulate truthful, adverse information as well as false adverse information about any candidate for office within the eighteen days next prior to any primary election wherein such candidate is particpipating as a candidate, unless the person and each person making or in anywise circulating the statement shall have furnished such candidate a written or printed copy thereof at least eighteen days prior to such election, and this regard-

less of how patriotic and *bona fide* the motive for the making of such adverse statement may be and regardless of whether or not the alleged facts were within the knowledge of the person making the statement at a time more than eighteen days before the election or whether or not the alleged facts occurred within eighteen days before the election. The effect would be to keep from the public and from the electors matters and things which they have the right to know and also have the right to discuss among themselves.

The statute does not condemn false or malicious charges or attacks only, but it as effectually attempts to prohibit the dissemination of the truth if such truth embraces a charge or attack on the candidate.

We might indulge in some preachment concerning the sacred right to free speech and freedom of the press, but this is hardly the place for such. It is enough to say that in our humble judgment this statute proposes to abridge both without lawful justification. Many offenses against human liberty have been perpetrated and perpetuated by the State and the Nation in the name of and under the guise of *police power*. This statute is but another attempt of the undue invoking of the police power.

Aside from this, I consider the statute void as violating the due process of law provision of the Constitution because of being indefinite and uncertain. The language of the statute is:

"Circulating Charges against any candidate within eighteen days of primary; copy delivered to candidate attacked. —It shall be unlawful for any candidate or other person, during the eighteen days next preceding the day of a primary election to publish or circulate, or cause to be published or circulated, any charge against or attack upon any candidate, unless a copy of such charge or attack has been personally served upon the candidates against whom made at least

eighteen days prior to the day of the primary, and any person publishing or circulating such charge or attack without a copy of the same having been personally served upon the person against whom the charge or attack is made, as herein required, shall be punished by a fine of not exceeding one thousand dollars, or be imprisoned not exceeding one year, or be punished by both such fine and imprisonment. Any answer to a charge or attack that contains only defensive matter shall not be construed to be a charge or attack."

The statute neither defines nor establishes a standard of guilt. What is a charge or attack against a candidate? Who is to determine whether or not a statement constitutes a charge or attack? There is no answer to be found in the Statute. If one says in Duval County that candidate for the office of Governor is in favor of the large counties of the State the result would probably be favorable to the candidate, but if the same person persuaded the electors of Glades or of Liberty County that such was a fact he would probably be considered by the candidate as being quite adverse to him. What might be considered a most desirable characteristic to be found in a candidate in one community might be considered most damning to him in another. There are precincts in this State where the statement that a candidate is a member of the Anti-Saloon League or a member of certain secret orders, would constitute a most effective charge and attack on him, while in other precincts the same statement would prove very helpful and be considered a friendly indication. So what might be a criminal offense in one locality would probably be an act of kindness and entirely lawful when done in another locality. A penal statute which is so vague and indefinite, I think, is void. So, I concur in the judgment that the petitioners be discharged.

ELLIS, J., concurs.