287 So.2d 78 (1973)
Pat L. TORNILLO, Jr., Appellant,
v.
The MIAMI HERALD PUBLISHING COMPANY, a Division of Knight Newspapers, Inc., Appellee.
No. 43009.
Supreme Court of Florida.
July 18, 1973.
Rehearing Denied October 10, 1973.
Jerome A. Barron, Syracuse, N.Y., Tobias Simon and Elizabeth J. du Fresne, Miami, for appellant.
Dan P.S. Paul and James W. Beasley, Jr., of Paul & Thomson, Miami, for appellee.
Robert L. Shevin, Atty. Gen., amicus curiae.
*79 Jonathan L. Alpert, Miami, Richard Yale Feder, Coral Gables, Irma Robbins Feder, Miami, and Warren S. Schwartz, Miami Beach, for amicus curiae, American Civil Liberties Union of Fla., Inc.
William C. Ballard of Baynard, McLeod, Lang, Eckert & Ballard, St. Petersburg, for amicus curiae, Times Publishing Co.
Donald U. Sessions, Daytona Beach, amicus curiae.
S. Lindsey Holland, Jr., of Crofton, Holland & Starling, Melbourne, for Gannett Florida Corp., News-Press Publishing Co. and Pensacola News-Journal, Inc., amicus curiae.
Harold B. Wahl, of Loftin & Wahl, Jacksonville, for Florida Publishing Co., amicus curiae.
Thomas T. Cobb, of Cobb, Cole, Sigerson, McCoy, Bell & Bond, Daytona Beach, for News-Journal Corp., amicus curiae.
Charles W. Pittman, of Macfarlane, Ferguson, Allison & Kelly, Tampa, for The Tribune Co., amicus curiae.
Terry McDavid, Lake City, for Lake City Reporter, amicus curiae.
James L. Livingston, of Livingston & Livingston, Sebring, for Sebring News, Inc., amicus curiae.
Malcolm B. Johnson, for The Tallahassee Democrat, amicus curiae.
Selig I. Goldin, of Goldin & Turner, Gainesville, for Gainesville Sun, amicus curiae.
Arthur I. Jacobs, Fernandina Beach, for Fernandina Beach News-Leader, amicus curiae.
A.W. Nichols, III, Palatka, for The Palatka Daily News, amicus curiae.
Willard Ayres, of Ayres, Swigert, Cluster, Tucker & Curry, Ocala, for Ocala Star-Banner, amicus curiae.
John F. Wendel, of Wendel & McArthur, P.A., Lakeland, for The Ledger, amicus curiae.
P.B. Howell, Jr., of Cherry, Howell & Cummins, Leesburg, for The Daily Commercial, amicus curiae.
Cecil H. Albury of Heuer, Albury & Okell, West Palm Beach, for Palm Beach Newspapers, Inc., amicus curiae.
PER CURIAM.
This cause is before us upon direct appeal from Circuit Court of Dade County, holding Florida Statute 104.38, F.S.A.[1] unconstitutional thereby vesting jurisdiction in this Court under Article V, Section 3(b)(1), Florida Constitution, as amended 1973, F.S.A.
Appellant Tornillo, plaintiff below, who was a candidate for the State Legislature demanded that appellee print verbatim his replies to two editorials printed therein attacking appellant's personal character. The appellee refused and Tornillo filed complaint for declaratory and injunctive relief and punitive damages. Pursuant to Florida Statute 86.091, F.S.A., the Attorney General of this State was advised that appellee intended to contest the constitutionality vel non of Florida Statute 104.38, F.S.A. In view of the circumstances, the trial court granted the request for an emergency hearing.
*80 Preliminarily, the trial court determined that the statutory provision in question is a criminal statute and that absent special circumstances, equity will not ordinarily enjoin commission of a crime. Pompano Horse Club Co. v. State, 93 Fla. 415, 111 So. 801 (1927). Notwithstanding this infirmity in appellant's complaint, the trial court further concluded that F.S. § 104.38, F.S.A. is violative of Article I, Sections 4 and 9 of the Constitution of Florida and the Fourteenth Amendment to the Constitution of the United States as a resraint upon freedom of speech and press and because it is impermissibly vague and indefinite.
Believing that the promulgation of this statute is authorized by Article IV, Section 4,[2] and the First[3] and Fourteenth Amendments to the Constitution of the United States, and Article VI, Section 1,[4] and Article I, Section 4[5] of the Florida Constitution, and believing that this statute enhances rather than abridges freedom of speech and press protected by the First Amendment, we hold that it does not constitute a violation of the First and Fourteenth Amendments to the Constitution of the United States or Article I, Section 4, Florida Constitution.
The election of leaders of our government by a majority of the qualified electors is the fundamental precept upon which our system of government is based, and is an integral part of our nation's history. Recognizing that there is a right to publish without prior governmental restraint,[6] we also emphasize that there is a correlative responsibility that the public be fully informed.
The entire concept of freedom of expression as seen by our founding fathers rests upon the necessity for a fully informed electorate. James Madison wrote that, "A popular government without popular information or the means of acquiring it is but a prologue to a farce or tragedy; or, perhaps both. Knowledge will forever govern ignorance; and a people who mean to be their own governors, must arm themselves with the power which knowledge gives (to W.T. Barry, August 4, 1822)."[7]
The public "need to know" is most critical during an election campaign. By enactment of the first comprehensive corrupt practices act relating to primary elections in 1909 our legislature responded to the need for insuring free and fair elections. Article III, Section 26, and Article VI, Section 9, Constitution of Florida 1885, *81 commanded the Legislature to pass laws "regulating elections and prohibiting under adequate penalties, all undue influence thereof from power, bribery, tumult or other improper practices" and to "enact such laws as will preserve the purity of the ballot given under this Constitution." This act of 1909 did not deal with the subject of the wrongful use of newspapers or other printed or written matter, with the exception of a provision which declared it to be a misdemeanor for any candidate or other person to have or distribute on day of primary at or near any polling place any writing against any candidate in the primary. Florida Statute 104.38, F.S.A., was originally enacted in 1913 as Chapter 6470, Section 12, Laws of Florida, 1913.[8] This second act adopted in 1913 known as the corrupt practices act was enacted to supplement the act of 1909. The statutory provision, the constitutionality vel non which is being questioned in the instant cause, was enacted not to punish, coerce or censor the press but rather as a part of a centuries old legislative task of maintaining conditions conducive to free and fair elections. The Legislature in 1913 decided that owners of the printing press had already achieved such political clout that when they engaged in character assailings, the victim's electoral chances were unduly and improperly diminished. To assure fairness in campaigns, the assailed candidate had to be provided an equivalent opportunity to respond; otherwise not only the candidate would be hurt but also the people would be deprived of both sides of the controversy.[9]
What some segments of the press seem to lose sight of is that the First Amendment guarantee is "not for the benefit of the press so much as for the benefit of us all."[10] Speech concerning public affairs is more than self expression. It is the essence of self government.[11]
Mr. Justice Learned Hand expressed the role of the press well when he emphasized,
"However neither exclusively, nor even primarily are the interests of the newspaper industry conclusive; for that industry serves one of the most vital of all general interests: The dissemination of *82 news from as many different sources and with as many different facets and colors as possible."[12]
In Pennekamp v. Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946), the Supreme Court of the United States emphasized that the power of the press must be tempered with responsibility when it explained,
"Without a free press there can be no free society. Freedom of the press, however, is not an end in itself but a means to the end of a free society. The scope and nature of the constitutional protection of freedom of speech must be viewed in that light and in that light applied. * * *
"A free press is vital to a democratic society because its freedom gives it power. Power in a democracy implies responsibility in its exercise. No institution in a democracy, either governmental or private, can have absolute power. Nor can the limits of power which enforce responsibility be finally determined by the limited power itself. ... In plain English, freedom carries with it responsibility even for the press; freedom of the press is not a freedom from responsibility for its exercise. Most State constitutions expressly provide for liability for abuse of the press's freedom. That there was such legal liability was so taken for granted by the framers of the First Amendment that it was not spelled out. Responsibility for its abuse was embedded in the law. The First Amendment safeguarded that right.
"The press does have the right, which is its professional function, to criticize and to advocate. The whole gamut of public affairs is the domain for fearless and critical comment, and not the least the administration of justice. But the public function which belongs to the press makes it an obligation of honor to exercise this function only with the fullest sense of responsibility. Without such a lively sense of responsibility a free press may readily become a powerful instrument of injustice." [Emphasis Supplied]
The concept which appears throughout the decisions underlying First Amendment guarantees that there is a broad societal interest in the free flow of information to the public by the Supreme Court of the United States was explicitly stated in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), as well as other Supreme Court decisions, as follows:
"The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard we have said, `was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498, 1506. `The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of the constitutional system.'"
The statute here under consideration is designed to add to the flow of information and ideas and does not constitute an incursion upon First Amendment rights or a prior restraint, since no specified newspaper content is excluded. There is nothing prohibited but rather it requires, in the interest of full and fair discussion, additional information.
The right of the public to know all sides of a controversy and from such information to be able to make an enlightened choice is being jeopardized by the growing concentration of the ownership of the mass *83 media into fewer and fewer hands, resulting ultimately in a form of private censorship. Through consolidation, syndication, acquisition of radio and television stations and the demise of vast numbers of newspapers, competition is rapidly vanishing and news corporations are acquiring monopolistic influence over huge areas of the country. We take note of a recent article in Florida Trend magazine, March 1973, explicating that the Miami Herald is the largest newspaper published in Florida, that it is larger in size than the next two largest newspapers; and that it is not only a large city daily newspaper but also is a regional and international newspaper.
Freedom of expression was retained by the people through the First Amendment for all the people and not merely for a select few. The First Amendment did not create a privileged class which through a monopoly of instruments of the newspaper industry would be able to deny to the people the freedom of expression which the First Amendment guarantees. The Supreme Court of the United States in Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013, clearly expounded,
"It would be strange indeed however if the grave concern for freedom of the press which prompted adoption of the First Amendment should be read as a command that the government was without power to protect that freedom. The First Amendment, far from providing an argument against application of the Sherman Act, here provides powerful reasons to the contrary. That Amendment rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society. Surely a command that the government itself shall not impede the free flow of ideas does not afford non-governmental combinations a refuge if they impose restraints upon that constitutionally guaranteed freedom. Freedom to publish means freedom for all and not for some. Freedom to publish is guaranteed by the Constitution, but freedom to combine to keep others from publishing is not. Freedom of the press from governmental interference under the First Amendment does not sanction repression of that freedom by private interests. The First Amendment affords not the slightest support for the contention that a combination to restrain trade in news and views has any constitutional immunity."
More recently in Red Lion Broadcasting Co. v. F.C.C., 127 U.S.App.D.C. 129, 381 F.2d 908, affirmed 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), the Supreme Court opined,
"Nor can we say that it is inconsistent with the First Amendment goal of producing an informed public capable of conducting its own affairs to require a broadcaster to permit answers to personal attacks occurring in the course of discussing controversial issues, or to require that the political opponents of those endorsed by the station be given a chance to communicate with the public. Otherwise, station owners and a few networks would have unfettered power to make time available only to the highest bidders, to communicate only their own views on public issues, people and candidates, and to permit on the air only those with whom they agreed. There is no sanctuary in the First Amendment for unlimited private censorship operating in a medium not open to all. `Freedom of the press from governmental interference under the First Amendment does not sanction repression of that freedom by private interests.' Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 1425, 89 L.Ed. 2013 (1945)."
By this tendency toward monopolization, the voice of the press tends to become exclusive in its observation and its wisdom which in turn deprives the public of their right to know both sides of controversial matters.
*84 Appellant urges that if a newspaper may attack a candidate with impunity and he is provided no right to reply, the public interest in free expression suffers, because they can only hear the publisher's side of the controversy and are denied the dissenting view.
Although we have carefully considered appellee's argument that Red Lion Broadcasting Co. v. F.C.C., supra, is inapplicable to the present cause, we cannot discount certain excerpts therefrom which are applicable to First Amendment guarantees in general. Therein, the Supreme Court explained that,
"Congress does not abridge freedom of speech or press by legislation directly or indirectly multiplying the voices and views presented to the public through time sharing, fairness doctrines, or other devices which limit or dissipate the power of those who sit astride the channels of communication." 395 U.S. at 401, n. 28, 89 S.Ct. at 1812.
That Court further stated in Red Lion Broadcasting v. F.C.C., supra, 395 U.S., at 390, 89 S.Ct. 1794, in Associated Press v. U.S., supra, 326 U.S., at 20, 65 S.Ct. 1416, and New York Times v. Sullivan, supra, 376 U.S. at 270, 84 S.Ct. 710, that it is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas wherein truth will prevail rather than to countenance a monopolization of that market whether by government or private enterprise.
Florida's right of reply statute is consistent with the First Amendment as applied to this State through the Fourteenth Amendment. In Rosenbloom v. Metromedia, 403 U.S. 29, 47, 91 S.Ct. 1811, 1821, 29 L.Ed.2d 296, we find that the Supreme Court of the United States is inclined to this position by the following quote from the majority opinion:
"Furthermore, in First Amendment terms, the cure seems far worse than the disease. If the States fear that private citizens will not be able to respond adequately to publicity involving them, the solution lies in the direction of ensuring their ability to respond, rather than in stifling public discussion of matters of public concern."
To this comment, the Court appended the following note:
"Some States have adopted retraction statutes or right-of-reply statutes. See Donnelly, The Right of Reply: An Alternative to an Action for Libel, 34 Va. L.Rev. 867 (1948); Note, Vindication of the Reputation of a Public Official, 80 Harv.L.Rev. 1730 (1967). Cf. Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).
"One writer, in arguing that the First Amendment itself should be read to guarantee a right of access to the media not limited to a right to respond to defamatory falsehoods, has suggested several ways the law might encourage public discussion. Barron, Access to the Press  A New First Amendment Right, 80 Harv.L.Rev. 1641, 1666-1678 (1967). It is important to recognize that the private individual often desires press exposure either for himself, his ideas, or his causes. Constitutional adjudication must take into account the individual's interest in access to the press as well as the individual's interest in preserving his reputation, even though libel actions by their nature encourage a narrow view of the individual's interest since they focus only on situations where the individual has been harmed by undesired press attention. A constitutional rule that deters the press from covering the ideas or activities of the private individual thus conceives the individual's interest too narrowly."
Although appellee attempts to minimize the import of the aforestated quotation, we feel compelled to note that such remarks regarding right to reply legislation is entirely *85 consistent with past precedent establishing the fundamental purpose of the First Amendment to inform the people.
Neither appellant nor appellee takes issue with the holding of the trial court that it lacked jurisdiction to enjoin an alleged violation of Florida Statute 104.38, F.S.A. This provision is criminal in nature and absent special circumstances equity will usually not enjoin commission of a crime.[13]
Appellant urges that the Right of Reply Statute in question is neither impermissibly vague nor unnecessarily broad. We must agree and therefore uphold the constitutionality of this statutory provision. It is a fundamental principle that this Court has the duty, if reasonably possible, consistent with protection of constitutional rights, to resolve all doubts as to the validity of a statute in favor of its constitutionality and if reasonably possible a statute should be construed so as not to conflict with the constitution.[14] Courts are inclined to adopt that reasonable interpretation of a statute which removes it farthest from constitutional infirmity. In Gitlow v. People of New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138, the Supreme Court of the United States stated every presumption is to be indulged in favor of the validity of a statute, and the case is to be considered in the light of the principle that the State is primarily the judge of regulations in the interest of public safety and welfare.
We do not believe that Florida's statutory right of reply is lacking in any of the required standards of preciseness. The statute is sufficiently explicit to inform those who are subject to it as to what conduct on their part will render them liable to its penalties.
We recognize that certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press and association for fear of violating an unclear law. Scull v. Virginia, 359 U.S. 344, 79 S.Ct. 838, 3 L.Ed.2d 865 (1959), Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1965).
In Brock v. Hardie, 114 Fla. 670, 154 So. 690, 694 (1934), relative to the issue of vagueness, this Court said,
"Whether the words of the Florida statute are sufficiently explicit to inform those who are subject to its provisions what conduct on their part will render them liable to its penalties is the test by which the statute must stand or fall, because, as was stated in the opinion above mentioned, `a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.'
"Such seems to be the test approved by the Supreme Court of the United States. Citation of authorities as to what may be considered the exact meaning of the phrase `so vague that men of common intelligence must necessarily guess at its meaning,' so that certain conduct may be considered within or outside the true meaning of that phrase, or what language of a statute may lie within or without it, would be of little aid to us.
"We must apply our own knowledge with which observation and experience *86 have supplied us in determining whether words employed by the statute are reasonably clear or nor in indicating the legislative purpose, so that a person who may be liable to the penalties of the act may know that he is within its provisions or not."
Inter alia, appellee attacks the constitutionality of the statute on grounds of vagueness and overbreadth because of the use of the term "any"  referring to the type of reply allowable. This statute provides in part,
"if any newspaper in its columns assails the personal character of any candidate for nomination or for election in any election, or charges said candidate with malfeasance or misfeasance in office, or otherwise attacks his official record, or gives to another free space for such purpose, such newspaper shall upon request of such candidate immediately publish free of cost any reply he may make thereto in as conspicuous a place and in the same kind of type as the matter that calls for such reply... ." [Emphasis Supplied]
Because of the longstanding policy of this Court to give a statute, if reasonably possible, a construction supporting its constitutionality, we hold that the mandate of the statute refers to "any reply" which is wholly responsive to the charge made in the editorial or other article in a newspaper being replied to and further that such reply will be neither libelous nor slanderous of the publication nor anyone else, nor vulgar nor profane.
We conclude that the statute in question is as certain and definite as others heretofore upheld as constitutionally permissible. The following statement made by Judge Tamm in Red Lion Broadcasting Co. v. F.C.C., supra, 381 F.2d at 921, is clearly applicable to the instant cause: "Here there is no broad-reaching, all-embracive statutory provision penalizing knowing as well as unknowing conduct."
Although apparently not raised before the trial court, the brief of Amicus Times Publishing Co. has raised the issue that Florida Statute 104.38, F.S.A., is a deprivation of property right without due process. With this contention, we can not agree. Florida Statute 104.38, F.S.A. is a valid exercise of the state police power enacted to assure the integrity of the electoral process. In Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928), the Supreme Court stated,
"And where the public interest is involved preferment of that interest over the property interest of the individual, to extent even of its destruction, is one of the distinguishing characteristics of every exercise of police power which affects property." Id. at 279, 280, 48 S.Ct. at 247.
We find this argument of deprivation of property rights by being required to furnish free space to be without merit. See Miller v. Schoene, supra; Marsh v. Alabama, 326 U.S. 501, at 506, 66 S.Ct. 276, 90 L.Ed. 265; Red Lion Broadcasting v. F.C.C., supra; Rosenbloom v. Metromedia, supra; Chronicle Publishing Co. v. Attorney General, 94 N.H. 148, 48 A.2d 478 (1946); Amalgamated Food Employees v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968).
In conclusion, we do not find that the operation of the statute would interfere with freedom of the press as guaranteed by the Florida Constitution and the Constitution of the United States. Indeed it strengthens the concept in that it presents both views leaving the reader the freedom to reach his own conclusion. This decision will encourage rather than impede the wide open and robust dissemination of ideas and counterthought which the concept of free press both fosters and protects and which is essential to intelligent self government.
Newspapers are not wholly dependent on electronic media as were the broadcasters in Red Lion Broadcasting Co. v. F.C.C., supra. However, we have no difficulty in *87 taking judicial notice that the publishers of newspapers in this contemporary era would perish without this vital source of communications. The dissemination of news other than purely local is transmitted over telegraph wires or over air waves. This not only includes dissemination of news but also in chain newspaper operations so prevalent today, the Miami Herald being one; even editorials are prepared in one place and transmitted electronically to another. Therefore, the principles of law enunciated in Red Lion Broadcasting Co. v. F.C.C., supra, have been taken into consideration in reaching our opinion.
A half free press would be deceptive to the public. Florida Statute 104.38, F.S.A., in the interest of all the people, provides that candidates for public office under certain prescribed circumstances shall have a right of reply, a right of expression. It does not deny to the owner of the instruments of the newspaper industry any right of expression. The statute assures, and does not abridge, the right of expression which the First Amendment guarantees. The statute supports the freedom of the press in its true meaning  that is, the right of the reader to the whole story, rather than half of it  and without which the reader would be "blacked out" as to the other side of the controversy.
For the foregoing reasons, we find Florida Statute 104.38, F.S.A. to be constitutional and reverse the holding of the trial court that it is unconstitutional.
Accordingly, the judgment of the trial court is reversed and this cause is remanded to the trial court for further proceedings not inconsistent herewith.
It is so ordered.
CARLTON, C.J., ADKINS, McCAIN and DEKLE, JJ., and RAWLS, District Court Judge, concur.
ROBERTS, J., concurs specially with Opinion in which CARLTON, C.J., ADKINS, McCAIN and DEKLE, JJ., and RAWLS, District Court Judge, concur.
BOYD, J., dissents with Opinion.
ROBERTS, Justice (specially concurring):
I concur in the opinion and judgment of the majority. We are fully cognizant of the recent decision rendered by the Supreme Court of the United States in Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772, decided May 29, 1973, which holds that neither the Federal Communications Act nor the First Amendment require broadcasters to accept paid editorial advertisements. But this opinion in no way derogated the earlier opinion of that court in Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), validating the fairness doctrine of the Federal Communications Commission which imposes two affirmative responsibilities on the broadcaster  coverage of issues must be adequate and must fairly reflect differing viewpoints. As the Supreme Court stated in Columbia Broadcasting, supra, "In fulfilling its Fairness Doctrine obligations, the broadcaster must provide free time for the presentation of opposing views if a paid sponsor is unavailable, ... and must initiate programming on public issues if no one else seeks to do so. See John J. Dempsey, 6 P & F Radio Reg. 615 (1950); Red Lion, supra, 395 U.S., at 378, 89 S.Ct., at 1800."
The complaints filed in Columbia Broadcasting, supra, by the Democratic National Committee and the Business Executives Move for Vietnam Peace, alleged that a broadcaster had violated the First Amendment by refusing to sell it time to broadcast spot announcements expressing political views of the different groups. The Supreme Court turned its decision primarily on the limited nature of the broadcasting airwaves and the existence of the Fairness Doctrine which requires broadcasters to provide free time for presentation of opposing political views when a paid sponsor is not available. The decision in Columbia Broadcasting is directed solely to the peculiar and limited nature of broadcasting *88 frequencies, and that decision is not applicable to the instant facts presently before this Court in the case sub judice. Chief Justice Burger commences the body of his opinion with the following remarks:
"Mr. Justice White's opinion for the Court in Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), makes clear that the broadcast media pose unique and special problems not present in the traditional free speech case. Unlike other media, broadcasting is subject to an inherent physical limitation. Broadcast frequencies are a scarce resource; they must be portioned out among applicants. All who possess the financial resources and the desire to communicate by television or radio cannot be satisfactorily accommodated. The Court spoke to this reality when, in Red Lion, we said `it is idle to posit an unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish.' Red Lion, supra, 395 U.S., at 388, 89 S.Ct., at 1806.
"Because the broadcast media utilize a valuable and limited public resource, there is also present an unusual order of First Amendment values. Red Lion discussed at length the application of the First Amendment to the broadcast media. In analyzing the broadcasters' claim that the Fairness Doctrine and two of its component rules violated their freedom of expression, we held that `[n]o one has a First Amendment right to a license or to monopolize a radio frequency; to deny a station license because "the public interest" requires it "is not a denial of free speech."' Red Lion, supra, 395 U.S., at 389, 89 S.Ct., at 1806. Although the broadcaster is not without protection under the First Amendment, United States v. Paramount Pictures, Inc., 334 U.S. 131, 166, 68 S.Ct. 915, 933, 92 L.Ed. 1260 (1948), `[i]t is the right of the viewers and listeners, not the right of the broadcasters, which is paramount... . It is the right of the public to receive suitable access to social, political, esthetic, moral and other ideas and experiences which is crucial here. That right may not constitutionally be abridged either by Congress or by the FCC.' Red Lion, supra, 395 U.S., at 390, 89 S.Ct., at 1806."
After recounting the history of broadcast regulations, the court in Columbia Broadcasting, supra, opined that broadcasters are charged with the duty of providing the listening and viewing public with access to a balanced presentation of information on issues of public importance. The Supreme Court was particularly concerned with forcing broadcasters to accept paid political advertisements when broadcasting frequencies are so limited because of a substantial risk that such a system would be monopolized by those who could and would pay the costs, and that a system so heavily weighted in favor of the financially affluent or those with access to wealth would in effect undermine the effective operation of the Fairness Doctrine. The views of the affluent would prevail since they would have it within their power to purchase time more frequently, and editorial advertising could then be monopolized by those of one political persuasion. Those were the concerns of the Supreme Court in Columbia Broadcasting, supra, when it rendered its decision that broadcasters are not required to accept paid editorial advertisements regardless of the content thereof.
Our opinion in the instant cause in no way conflicts with the recent decision of the Supreme Court in Columbia Broadcasting, supra.
CARLTON, C.J., ADKINS, McCAIN and DEKLE, JJ., and RAWLS, District Court Judge, concur.
BOYD, Justice (dissenting):
I respectfully dissent.
This statute carries a penalty provision for violations thereof, and it therefore *89 must be most strictly construed in favor of any person accused thereunder. The statute is so vague on its face as to raise doubts in the minds of those reading it as to the exact underlying legislative intent.
There are no standards as to when a publisher must carry a reply. For example, the following are just some of the important questions left unanswered by this statute. Does the law include both news stories and editorial comment? If a story mentions a "situation", but does not mention the candidate by name, may he reply? When the publisher knows his statements are true, must he publish a statement from the candidate which he knows to be false? If the reply of the candidate libels other persons, must the publisher print it, and, if so, is the publisher subject to liability for any resulting libel suit? If the candidate's reply were to contain obscene language, would the publisher still have to print it  and thereby invite prosecution under our obscenity laws?
The First Amendment to the Constitution of the United States provides that, "Congress shall make no law ... abridging the freedom of speech, or of the press... ." Article I, Section 4 of the Constitution of the State of Florida similarly provides: "No law shall be passed to restrain or abridge the liberty of speech or of the press." Since these constitutional provisions prohibit the government from limiting the right of the publishing press to publish news and comment editorially, it would be equally unconstitutional for the government to compel a publisher to print a statement of any other person, or persons, against that publisher's will.
The majority opinion correctly observes that freedom of speech and freedom of the press carry the duty to speak the truth. And, of course, the constitutional rights of freedom of speech and freedom of the press must be exercised with appropriate regard to the provisions of our libel and obscenity statutes. As in all other areas of public and private service, some errors will, from time to time, surely occur. Yet, recognizing that the survival of a free press is contingent upon the press fulfilling its duty to the general public, the overwhelming majority of those in the publishing press comply with the highest of ethical standards.
We are taught in the Bible that, "the truth will make you free".[1]
Free people can make proper decisions for their own self-government only when they are adequately informed by a free press. To the extent that government limits or adds to that which a publisher must distribute, freedom of speech and freedom of the press are thereby diminished.
Almost everyone whose name has been carried frequently in the news media has been offended, at one time or another, by stories or comments with which he disagrees. This is part of the price one pays for success and notoriety. If there exists a problem in this state of affairs, the muzzling of a free press is not the solution to such problem.
I therefore dissent.

On Petition For Rehearing
PER CURIAM.
Appellee, Miami Herald, by petition for rehearing strenuously argues that this Court's opinion overlooks the fact that § 104.38, Florida Statutes, F.S.A., is a criminal statute and that this Court is without power to rewrite or perform plastic surgery on a criminal statute in an attempt to cure the statute's vagueness by writing a definition of "reply". Appellee then journeys upon numerous hypothetical inquiries  What is a newspaper? What is an assault? What is an equally "conspicuous place"?  and then reasons that these "obvious ambiguities" render the subject statute *90 so vague that same must be held unconstitutional.
As was emphatically stated in the opinion of this Court, the action underlying this cause before us is a civil action which was filed in the Circuit Court for the Eleventh Judicial Circuit seeking to require appellee to publish appellant's reply pursuant to Florida Statute 104.38, F.S.A. and for damages. No criminal penalty is sought in the case sub judice, and, therefore, the validity vel non of the criminal penalty is not here involved. We are not unmindful of the line of decisions from this Court and the Supreme Court of the United States requiring more specificity in statutory authorship to support a statute which imposes a criminal penalty. However, the language of our opinion clearly defines what would constitute a wrongdoing. We take this opportunity to restate the following excerpt from our opinion:
"It is a fundamental principle that this Court has the duty, if reasonably possible, consistent with protection of constitutional rights, to resolve all doubts as to the validity of a statute in favor of its constitutionality and if reasonably possible a statute should be construed so as not to conflict with the constitution.[1] Courts are inclined to adopt that reasonable interpretation of a statute which removes it farthest from constitutional infirmity. In Gitlow v. People of New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138, the Supreme Court of the United States stated every presumption is to be indulged in favor of the validity of a statute, and the case is to be considered in the light of the principle that the State is primarily the judge of regulations in the interest of public safety and welfare."
Even had this Court found the statute, the constitutionality vel non which is being questioned sub judice, not to be sufficiently definite and specific to support a criminal penalty, this criminal penalty provision would not be fatal to the statute because the statute is so constructed that the criminal penalty can be easily severed and deleted and still leave a complete legislative expression establishing a civil right to damages. This Court has long held that where certain clauses, provisions, or sections of a statutory enactment are in violation of constitutional mandates, it does not necessarily follow that the whole enactment should fail, and this Court has held that the Court may sever the unconstitutional provision and uphold the remainder if that which is left is complete in itself, sensible, and capable of being executed, whether or not the enactment contains a severability clause. State ex rel. Boyd v. Deal, 24 Fla. 293, 4 So. 899 (1888); Gwynn v. Hardee, 92 Fla. 543, 110 So. 343 (1926); Louis K. Liggett Co. v. Lee, 109 Fla. 477, 147 So. 463, 149 So. 8 (1933); City of Daytona Beach v. Harvey, 48 So.2d 924 (Fla. 1950); Youngblood v. Darby, 58 So.2d 315 (Fla. 1952); Harris v. Bryan, 89 So.2d 601 (Fla. 1956); Cramp v. Board of Public Instruction of Orange County, 137 So.2d 828 (Fla. 1962); Davis v. State, 146 So.2d 892 (Fla. 1962); Musleh v. Marion County, 200 So.2d 168 (Fla. 1967); Small v. Sun Oil Company, 222 So.2d 196 (Fla. 1969). In State v. Newell, 85 So.2d 124 (Fla. 1956), this Court opined:
"We have held that it is not always necessary to declare an entire Act invalid where a portion thereof is unconstitutional simply because the Act does not contain a severability clause. State v. Calhoun County, 126 Fla. 376, 170 So. 883, 886, and cases therein cited. The *91 test is whether this court can say that the Legislature would not have enacted the law under scrutiny except for the provision which is herein held unconstitutional and invalid."
A comparable statute to Florida Statute 104.38, F.S.A. requiring a full and fair correction, apology, and retraction to be published in the same editions or corresponding issues of the periodical in which said article appeared, and in as conspicuous place and type as was said original article,[2] as an abatement of the publisher's liability for punitive damages, was held constitutional by this Court in Ross v. Gore, 48 So.2d 412 (Fla. 1950). Courts have generally regarded this type of statute to be in aid of a free press. We take judicial notice that this statute has been frequently used to avoid punitive damages apparently with no adverse effect to newspaper publishers. But, indeed, this statute has been utilized to their financial advantage.
We also here note another retraction statute promulgated by the Florida Legislature which defines a procedure for abatement of criminal penalty. Florida Statute 836.08, F.S.A., provides:
"Correction, apology, or retraction by newspaper.  If it appears upon the trial that said article was published in good faith, that its falsity was due to an honest mistake of the facts, and that there were reasonable grounds for believing that the statements in said article were true, and that within ten days after the service of said notice a full and fair conrection, apology and retraction was published in the same editions or corresponding issues of the newspaper or periodical in which said article appeared, and in as conspicuous place and type as was said original article, then any criminal proceeding charging libel based on an article so retracted, shall be discontinued and barred."
Reverting to the hypothetical inquiries posed by appellee, it is observed that similar questions might well be posed as to the vagueness of certain provisions of Florida Statute 770.02, F.S.A., viz: "good faith"; "falsity"; "a full and fair correction"; "apology"; "conspicuous place"; and Florida Statute 836.08, F.S.A., viz: "correction"; "apology"; "reasonable grounds"; or "a full and fair correction". In short, the definition and meaning of specific words or phrases in a particular factual situation have been and will be an infinite subject of inquiry so long as Homo sapiens engage in the art of communication. At this stage of the instant controversy, we are confronted not with the wisdom of the Legislature in enacting the challenged statutory provision; our task is to preserve the prerogative of the legislative body unless it clearly contravenes the basic federal and state charters adopted by our citizenry.
In conclusion, it must be remembered that First Amendment Freedom of the Press is for the benefit of all the people and not just those who have invested money in the publishing business.
The petition for rehearing is denied.
CARLTON, C.J., ROBERTS, ADKINS, McCAIN and DEKLE, JJ., and RAWLS, District Court Judge, concur.
BOYD, J., dissents.
NOTES
[1] F.S. § 104.38  Newspaper assailing candidate in an election; space for reply.  If any newspaper in its columns assails the personal character of any candidate for nomination or for election in any election, or charges said candidate with malfeasance or misfeasance in office, or otherwise attacks his official record, or gives to another free space for such purpose, such newspaper shall upon request of such candidate immediately publish free of cost any reply he may make thereto in as conspicuous a place and in the same kind of type as the matter that calls for such reply, provided such reply does not take up more space than the matter replied to. Any person or firm failing to comply with the provisions of this section shall be guilty of a misdemeanor of the first degree, punishable as provided in § 775.082 or § 775.083.
[2] Section 4. The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against invasion; and On Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.
[3] Amendment I. Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; ...
[4] Section 1. Regulation of elections.  All elections by the people shall be by direct and secret vote. General elections shall be determined by a plurality of votes cast. Registration and elections shall, and political party functions may, be regulated by law.
[5] Section 4. Freedom of speech and press.  Every person may speak, write and publish his sentiments on all subjects but shall be responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions and civil actions for defamation the truth may be given in evidence. If the matter charged as defamatory is true and was published with good motives, the party shall be acquitted or exonerated.
[6] Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357; New York Times v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822; Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313; Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398.
[7] 6 Writings of James Madison 398 (Hunt Ed. 1906), The Complete Madison 337 (1953).
[8] Chapter 6470, Section 12 (Laws of Florida, 1913), provided, "That if any newspaper in its columns assails the personal character of any candidate for nomination in a primary election, or charges such candidate with malfeasance or misfeasance in office, or otherwise attacks his official record, or gives to another free space for such purpose, such newspaper shall, upon request of such candidate, immediately publish free of cost any reply he may make thereto, in as conspicuous a place and in the same kind of type as the matter that calls for such reply; provided, such reply does not take up more space than the matter replied to. A person who fails to comply with the provisions of this Section, shall upon conviction be punished by fine not exceeding five hundred dollars, or by imprisonment." See subsequent history of statute, Section 5927, Revised General Statutes of Florida, 1920, entitled newspaper assailing candidate must give free space for reply. This provision was reenacted as Section 875.40, Florida Statutes, which varies only slightly from the present law. Section 875.40, Florida Statutes, was identical to Chapter 6470, Section 12 (Laws of Florida, 1913). In 1951, the Legislature renumbered and slightly revised this provision to cover any elections (not just primaries) and to provide that, "Any one failing to comply with the provisions of the section shall, upon conviction, be guilty of a misdemeanor." Chapter 26870, Laws of Florida, 1951. Section 104.38 was entitled, "Newspaper assailing candidate in election; space for reply." See also Chapter 28151, General Laws, 1953, which adds the words "or for election" so that the preliminary portion of the statute reads: "If any newspaper in its columns assails the personal character of any candidate for nomination or for election in any election... ." In 1972, HB 2801 attempting to repeal F.S. 104.38 died in committee.
[9] Ex parte Hawthorne, 116 Fla. 608, 156 So. 619 (1934). 9 Florida L.J. 297 (1935), "Brief History of the Corrupt Practices Act of Florida," J.V. Keen.
[10] Time, Inc. v. Hill, 385 U.S. 374, 389, 87 S.Ct. 534, 543, 17 L.Ed.2d 456.
[11] Garrison v. Louisiana, 379 U.S. 64, 74-75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).
[12] United States v. Associated Press, D.C., 52 F. Supp. 362, 372.
[13] Pompano Horse Club Co. v. State, supra; 17 Fla.Jur. Injunctions, § 46.
[14] Buck v. Gibbs, D.C., 34 F. Supp. 510, Mod. 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1940); Hunter v. Owens, 80 Fla. 812, 86 So. 839 (1920); Cragin v. Ocean & Lake Realty Co., 101 Fla. 1324, 133 So. 569, 135 So. 795 (1931), appeal dism. 286 U.S. 523, 52 S.Ct. 494, 76 L.Ed. 1267; Haworth v. Chapman, 113 Fla. 591, 152 So. 663 (1933); Hanson v. State, 56 So.2d 129 (Fla. 1952); Overstreet v. Blum, 227 So.2d 197 (Fla. 1969); Hancock v. Sapp, 225 So.2d 411 (Fla. 1969); Rich v. Ryals, 212 So.2d 641 (Fla. 1968).
[1] John 8:32.
[1] Buck v. Gibbs, D.C., 34 F. Supp. 510, mod. Watson v. Back, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1940); Hunter v. Owens, 80 Fla. 812, 86 So. 839 (1920); Cragin v. Ocean & Lake Realty Co., 101 Fla. 1324, 133 So. 569, 101 Fla. 1324, 135 So. 795 (1931), appeal dism., 286 U.S. 523, 72 S.Ct. 494, 76 L.Ed. 1267; Haworth v. Chapmen, 113 Fla. 591, 152 So. 663 (1933); Hanson v. State, 56 So.2d 129 (Fla. 1952); Overstreet v. Blum, 227 So.2d 197 (Fla. 1969); Hancock v. Sapp, 225 So.2d 411 (Fla. 1969); Rich v. Ryals, 212 So.2d 641 (Fla. 1968).
[2] Florida Statute 770.02, F.S.A. provides:

"If it appears upon the trial that said article was published in good faith, that its falsity was due to an honest mistake of the facts, and that there were reasonable grounds for believing that the statements in said article were true, and that within ten days after the service of said notice a full and fair correction, apology and retraction was published in the same editions or corresponding issues of the newspaper or periodical in which said article appeared, and in as conspicuous place and type as was said original article, then the plaintiff in such case shall recover only actual damages."